William **KUCHINSKAS**, et al., Plaintiffs,

v.

**BROWARD COUNTY**, et al., Defendants.

No. 91–6537–CIV.

United States District Court,
S.D. Florida.

Sept. 7, 1993.

John J. Copelan, Jr., County Atty., Ft. Lauderdale, FL, for Broward County.

Norman M. Ostrau, Rebecca L. Kay, Asst. County Attys., co-counsel for defendant.

Jack Scarola, Searcy Denney Scarola Barnhart & Shipley, P.A., West Palm Beach, FL, Brenda J. Carter, Fort Lauderdale, FL, for plaintiffs.

## *ORDER*

UNGARO-BENAGES, District Judge.

THIS CAUSE was tried before the Court without a jury for two days, May 26th and 27th, 1993. The Court has carefully considered all of the testimony and exhibits offered by the parties at trial, the entire record herein, the proposed findings and conclusions and all memoranda of law submitted by the parties. Having done so, and being otherwise fully advised in the premises, the Court

herewith renders this opinion containing Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### Nature of the Case

This action was instituted by Plaintiffs William Kuchinskas and Roberta Hartwell pursuant to the Fair Labor Standards Act, as amended, 29 U.S.C. § 201 *et seq.* ("FLSA"). In their Complaint, Plaintiffs allege that they and other present and former employees of Broward County ("County") are entitled to recover back overtime pay and liquidated damages because the County allegedly subjected them to a policy or practice that required them to use accrued "leave compensation" and/or reduced their actual pay to cover partial-day absences. In accordance with the provisions of 29 U.S.C. § 216(b), 115 other present and former County employees have opted-in to the Plaintiff class. All class members assert a claim for overtime pay and liquidated damages for a period of three years prior to the filing of this action to the present.

### Findings of Fact

1. Defendant is a political subdivision of the State of Florida. (Stipulation "Stip.", Transcript "Tr.", p. 16).

2. For the purposes of the liability stage, Plaintiffs are current or former employees of the Defendant whose job duties are or were classified as "executive, administrative, and professional" ("EAP") employees, and whose salaries have exceeded $250 per week at all times relevant to this action. (Stip., p. 17; Joint Motion for Bifurcation).

3. The FLSA exempts "executive, administrative and professional" ("EAP") employees who are paid on a "salary basis" from the FLSA's overtime and minimum wage requirements.

4. The County did not pay overtime to the Plaintiffs because the County believed them to be exempt from the minimum wage and overtime provisions of the FLSA.

5. Regardless of job classification, County employees receive, in addition to salary, certain benefits, such as, annual leave, sick leave, and administrative leave. Leave days accrue in accordance with formulas set forth in the Civil Service Rules and Regulations ("CSRR"). (Def. Ex. 45, 46, 47). Upon termination of employment or retirement, County employees are to be paid for all accrued and unused leave time. (Def. Ex. 45; Def. Ex. 46, § 14.228(i); Tr. 199).

6. Prior to the County's September 11, 1991, clarification of its Civil Service Rules, the Rules did not differentiate between employees subject to the overtime provisions of the FLSA and the EAP employees who the County considered exempt from the overtime provisions. (Tr. 196–97; Def. Ex. 46, CSRR Sept. 1990). The Rules classified "tardiness" as constituting an unexcused absence from work and penalized any tardy employee 15 minutes pay for every 15 minutes the employee was late. (Def. Ex. 46, 47). With respect to partial-day absences, the Rules simply stated that employees were required to reduce their leave banks in hourly increments for each hour they were not working. Partial-day absences occurred when an employee had a doctor's appointment during work hours, became sick during the workday, or wanted to take half of a vacation day.

7. As the CSRR did not specifically set forth a manner for dealing with partial-day absences of the EAP employees, various practices developed among the County's 58 different organizational units. (Defendant's Ex. 1, 11; Tr. 133, 147, 151, 154–55). One practice that was common throughout the organization was to expect exempt employees who were absent for part of a workday to "flex" their work schedule. This meant that if an exempt employee arrived an hour late for work, she would stay beyond 5:00 p.m. (Tr. 90, 153–56).

8. However if it was not possible for an employee to "flex" her schedule, or she simply chose not to, the employee could charge the hours missed to one of her accrued leave time "banks". (Stip., Tr. 18; Tr. 154–55). In this manner, charges to leave banks for partial-day absences were common among the County's EAP employees. (Tr. 112, 198).

9. County Personnel Director Philip Rosenberg and the heads of at least 36 of the County's 58 organizational units never interpreted the County's personnel rules and reg-

ulations as requiring reductions in pay for partial-day absences by exempt employees. (Stip, p. 117; Tr. 154). Accordingly no payroll deductions for partial-day absences were ever made in their departments. (Stip., p. 117, Def. Ex. 61). Thus although partial-day deductions were theoretically possible throughout the County, only certain department heads imposed deductions for partial-day absences, and only certain employees of the County suffered actual deductions.

10. Only 7 of the 117 Plaintiffs, and 73 of the more than 2,0000 EAP employees since 1988, had actual deductions from salary made for partial day absences. (Def. Ex. # 60, Stip.; Tr. 17–18). However, these deductions were never made for lack of work, and no EAP employee was ever "docked" pay for a partial-day absence because he or she had exhausted all of their accrued leave time. (Stip., Tr. 17, 238–39; see also Tr. 90, 262, 264).

11. The County also required its entire workforce (including its highly-paid top administrators) to document their time worked on an hourly basis. (Def. Ex. 4–5). In most instances, the County's hourly reporting requirements were fulfilled through the daily completion of time sheets. (Def. Ex. 4–5). Because EAP employees were not believed to be eligible for overtime, many simply accounted for their "regular" 7½ hour day while others recorded their actual time worked. (Stip., Tr. 27).

12. Many of the EAP employees also had set working hours and were required to complete leave request forms and have them approved in advance for each hour they wanted to take off. Approval of leave time was necessary so that, "insofar as practicable, the division or office can function without the hiring of additional, temporary help." (Def. Ex. 45, CSRR pre–1991 changes, § 118.054; Def. Ex. 46, § 14.228(d)). If an employee was absent from work and that absence was "not authorized by a specific grant of leave ..., such an absence shall be

without pay and shall be subject to disciplinary action." (Def. Ex. 45, § 118.16; Def. Ex. 46, § 14.239).

13. Some EAP employees were also required to "earn" job basis leave by working two hours overtime for every hour of leave, and the EAP employees' salaries were understood to be 2,080 hours a year. (T. 220; T. 218; Plaintiff's Ex. Tab # 3, # 7–10, # 14–28). Furthermore the EAP employees' pay stubs indicated an hourly rate of pay; it was these hourly increments that were used to reduce the employees' accrued leave banks for partial day absences. (Pl.Ex. # 11).

14. Many of the County's practices were typical among employers in the public sector where traditional principles of public accountability caused state and local governments to preclude payment for hours not worked and account separately for paid leave. (Tr. 148–50, 245–53; DOL Final Rule, 57 Fed.Reg. 37667 (1992)).

15. Following the Supreme Court's 1985 decision in *Garcia v. San Antonio Metropolitan Transit Authority,* Broward County, with the assistance of outside labor counsel, initiated a comprehensive effort to review and revise its personnel policies and procedures to comply with the FLSA. (Tr. 93, 259 [Bugg depo. 30–36]; Def. Ex. 6, 7, 20). Continued compliance efforts were made in subsequent years.[1] (Tr. 105, 145–50; Def. Ex. 8–10, 21). However, reflecting the then-current understanding of the law, these efforts uncovered no payroll practices inconsistent with the Department of Labor (DOL) "salary basis" rule. (Tr. 93, 259 [Bugg depo. 30–36]; Def. Ex. 7, 13, p. 6).

16. In 1990, the Ninth Circuit rejected long-standing public accountability principles in favor of a total prohibition on deductions for partial day absences. *Abshire v. County of Kern.* Although Rosenberg did not believe the County's existing policies violated the FLSA,[2] he believed that due to *Abshire,*

1. In 1989, the County hired Philip Rosenberg as Personnel Director. Rosenberg, an experienced public sector personnel specialist, was well-acquainted with the FLSA and implemented a "full-scale" review of County job classifications

and a comprehensive examination of the County's payroll practices and procedures. (Tr. 150).

2. "[P]ublic sector accountability was not inconsistent with the FLSA ... [and] just because leave time or salaries were reflected in hourly

it would be in the County's best interest to clarify its published timekeeping policies. Therefore the County, with the assistance of new labor counsel, launched another full-scale review of its payroll practices. (Tr. 260, 97).

17. In order to ascertain existing policies and obtain suggestions for new procedures, Rosenberg initiated communications with several key County administrators, including Accounting Division Director Evan Lukic and Recording Division Manager William Kuchinskas. Soon after these communications, Kuchinskas, Lukic and other top managers filed a salary basis lawsuit against the County. (Tr. 161, 165; Defendant's Ex. 22). The lawsuit did not alter the County's existing FLSA compliance efforts. (Tr. 260).

18. The County revised its Civil Service Rules and related personnel policies in September of 1991. These revisions added a new policy which ensured that EAP personnel would not lose pay as a result of partial-day absences, even if they had exhausted their accrued leave time. (See 1991 CSRR, § 14.39; Tr. 177, 183; Def. Ex. 23, 24, 26, 28). The County's personnel rules were also clarified to ensure that EAP employees were not financially penalized for tardiness. (Tr. 27). After ratification by the County Commission, the revised regulations were published and distributed, and County managers and payroll clerks were given specific compliance training. (Tr. 179; Def. Ex. 26, 27, 58).

19. At the same time that it clarified its personnel policies, the County also began a comprehensive audit to determine whether any of its exempt employees had ever previously lost pay as a result of a partial-day absence. (Tr. 169). After a review of thousands of payroll transactions occurring since 1988, the County learned that 73 exempt employees (1.2% of the County workforce)

had received a salary reduction due to a partial-day absence. These employees (including 7 Plaintiffs) were promptly repaid with interest their lost wages which, for the County's entire three-year payroll, totaled only $11,039.00. (Def. Ex. 32, 34, 35, 37; Tr. 184; Stip. p. 17).

20. The County's audit did not take into account reductions to employee leave banks as a result of partial-day absences; thus employees were not credited for any deductions to leave banks. (Tr. 199–201). The audit also failed to consider whether retired or terminated employees suffered reductions in compensation upon their separation from the County due to debits to their leave banks on account of partial-day absences.

21. The County continued its FLSA compliance efforts after the revisions to the CSRR in 1991. (Tr. 180–182; Def. Ex. 28, 30). In February of 1992, the County further clarified its timekeeping policies to eliminate the need for EAP employees to complete daily time sheets. (Tr. 180–82; Def. Ex. 28, 30). In March 1992, after a California court questioned the legality of even charging leave banks of supposedly exempt employees for partial-day absences, the County completely suspended the practice. (Pl. Ex. 45; Tr. 180–82; Def. Ex. 31).

22. Although the County suspended these policies, the County continued to stress the importance of maintaining accountability for employee work and performance while balancing that need with the flexibility associated with the EAP employees. (Def. Ex. 28, 29).

23. In August of 1992, the DOL finalized its interim rule that allowed public sector employers to reduce their salary based employees's pay or leave bank for partial-day absences. 29 CFR § 541.5d.[3]

---

increments ... did not mean that [an EAP] should not be considered exempt from the FLSA." (Rosenberg Tr. 150).

**3.** The Court will not apply the "public employee" exception of 29 C.F.R. § 541.5d retroactively as suggested by Broward County. "The Secretary withdrew a proposed regulation that would have given the exemption retroactive effect. 57 Fed. Reg. 37678 (Aug. 19, 1992). We agree with the Secretary that the rule would have been invalid

because the FLSA does not authorize retroactive rulemaking. *See generally Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208 [109 S.Ct. 468, 472, 102 L.Ed.2d 493] (1988) ('... a statutory grant of legislative rulemaking authority will not ... be understood to encompass the power to promulgate retroactive rules unless the power is conveyed by Congress in express terms.')" *Michigan Assoc. of Government Employees v.*

24. After the DOL August 1992 rulemaking validated the County's pre-*Abshire* payroll procedures, the County again revised its policies to allow for partial-day pay practices consistent with its public accountability objectives. (Pl.Ex. 54).

### Conclusions of Law

1. The Court has jurisdiction over this action pursuant to the United States Constitution, Art. III, § 2, Cl.1 and 28 USC § 1331.

2. The FLSA requires that covered, non-exempt employees receive minimum wage for all hours worked and overtime pay, at time and a half the regular rate of pay, for all hours worked over forty hours in a work week. 29 USC § 207(a)(1).

3. Section 13(a)(1) provides a statutory exemption from these requirements to all employees employed in a "bona fide" executive, administrative, or professional capacity. 29 USC § 213(a)(1).

4. Congress however failed to define "bona fide executive" in the FLSA, choosing instead to delegate that responsibility to the Secretary of Labor. 29 U.S.C. § 213(a)(1). The regulations define "bona fide executives" as employees with supervisory duties who are paid on a salary basis as opposed to an hourly wage. 29 CFR 541.1(f); 29 CFR § 541.117(a). Generally, in order to claim an exemption, an employer must prove that the employee meets both the "duties test" and the "salary test". *See Abshire v. County of Kern,* 908 F.2d 483, 484 (9th Cir.1990) *cert. denied,* 498 U.S. 1068, 111 S.Ct. 785, 112 L.Ed.2d 848, *rehearing denied,* 499 U.S. 932, 111 S.Ct. 1341, 113 L.Ed.2d 272 (1991); *Atlanta Professional Firefighters Union v. Atlanta,* 920 F.2d 800, 805 (11th Cir.1991) ("the 'short test' requires that an employee be paid on a 'salary basis' and have a 'primary duty' as an administrator").

5. Thus an employee whose terms and conditions of employment meet the stated exemption requirements need not be paid

overtime premium pay for hours worked over 40 hours per week. However, the employer bears the burden of showing that the exemption applies to employees, *Corning Glass Works v. Brennan,* 417 U.S. 188, 196–97, 94 S.Ct. 2223, 2229, 41 L.Ed.2d 1 (1974), and the exemptions are to be narrowly construed in order to further Congress's goal of providing broad federal employment protection. *Mitchell v. Lublin, McGaughy & Associates,* 358 U.S. 207, 211, 79 S.Ct. 260, 264, 3 L.Ed.2d 243 (1959).

6. An employee will be considered to be paid "on a salary basis" if the employee regularly receives "a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed" regardless of the actual number of hours worked. 29 CFR § 541.118(a). The regulation does not define the term "compensation" and does not otherwise provide any guidance with respect to whether "compensation" includes benefits such as administrative and sick leave.[4]

7. As for deductions, the regulations state that they may not be made "for absences occasioned by the employer or by the operating requirements of the business," such as "deductions … for time when work is not available." § 541.118(a)(1). Deductions may however be made from an employee's predetermined compensation without invalidating the employee's salaried status when an employee is absent from work for one full day or more for personal reasons, sickness, or disability as long as the deduction is made according to a plan, policy, or practice. § 541.118(a)(2), (3). Likewise, deductions imposed "in good faith for infractions of safety rules of major significance" also will not affect an employee's salaried status. § 541.-118(a)(5).

8. The regulations do not describe other employment practices that might affect an

*Michigan Dept. of Corrections,* 1 WH Cas. (BNA) 574, 575 (6th Cir.1993).

4. The Court disagrees with Defendant's argument that 29 CFR § 541.118 is unconstitutional as applied to state and local government employers. Rather the Court finds that § 541.118 does

not violate the Tenth Amendment as it does not impair the state's ability to function effectively in the federal system and thus is not inconsistent with the Constitution's allocation of power between the federal and state governments.

employee's classification, but instead state that the effect on the salaried status of an employee when an impermissible deduction is made will depend on the facts of each case.

**History**

9. In 1974, Congress extended coverage under the FLSA to all public sector employees.[5] However in 1976 the Supreme Court held that the FLSA's minimum wage and overtime pay provisions could not be constitutionally applied to State and local government employees engaged in traditional governmental activities. *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976); *See also* 57 Fed.Reg. 37666 (1992).

10. In 1985, nine years later, the Supreme Court reversed *National League of Cities* and held that the FLSA was applicable to State and local governments under the Commerce Clause of the Constitution. *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). In November of 1985, in response to *Garcia,* Congress amended the FLSA to include State and local governments and provided employers with a one year grace period in which to comply with the newly amended FLSA.

11. The 1985 Amendments did not however affect section 13(a)(1) of the Act or specifically address the application of the executive, administrative, or professional employee exemption to State and local government employees. *See* 57 Fed.Reg. at 37667. In fact, neither the statutory changes nor the legislative history of the 1985 Amendments contain any significant references to section 13(a)(1) or 29 CFR part 541.

12. At the time of *Garcia* and the subsequent amendments to the FLSA, State and local governments had regulations and policies that had evolved and been in place for years. 57 Fed.Reg. at 37667. The State and local government's pay systems that had evolved were "generally premised on a concept derived from principles of public accountability that governmental employees should not be paid for time not worked due to the need to be accountable to the taxpay-

ers for the expenditure of public funds." *Id.* "Public accountability is a broad concept that forms the foundation for many governmental administrative practices, including most public sector pay systems, and ... embodies the concept that elected officials and public agencies are held to a higher level of responsibility under the public trust that demands effective and efficient use of public funds in order to serve the public interest. It includes the notion that the use of public funds should always be in the public interest and not for individual or private gain." *Id.* at 37676. Thus at the time of *Garcia,* most public employers had compensation systems in place which required all employees, regardless of pay, to use accrued leave time or incur a reduction of pay for any absences from work. *Id.* at 37667.

13. As a result of the strong governmental interest in public accountability and the failure of the FLSA and DOL to address public employment specifically, public employers became uncertain whether their payroll practices, including payroll systems which prohibited otherwise exempt employees from being paid for absences of less than a day, were in compliance with the FLSA. *Id.*

14. Although the DOL recognized the potential conflict between the FLSA and the concept of public accountability, it failed to revise the salary regulations as they applied to public employers and, instead, on January 9, 1987, the DOL adopted a nonenforcement policy which allowed public employers to make deductions for partial day absences without destroying an exempt employee's status. *Id.* at 37668. The policy however was applicable only where a State or local law existed, and was in effect prior to April 15, 1986, which prohibited payments to an employee for hours not worked. *Id.* Thus if a public employer could show that a provision of a State or local law was in effect prior to April 15, 1986, deductions made for partial day absences would not effect a public employee's exempt status.

15. Neither *Garcia* nor the 1985 amendments to the FLSA expressly stated whether

---

**5.** As originally enacted, the FLSA excluded public sector employees.

a partial-day absence would negate a bona fide executive's "salary based" status. Rather the regulations state that a salary based employee must regularly receive "a predetermined amount constituting all or part of his compensation" and that deductions may be made for absences of a full day or longer. 29 CFR § 541.118. Since the Supreme Court's decision in *Garcia*, there have been numerous lawsuits filed by public employees to recover overtime pay. "[I]n many of these cases the resolution of the exempt status of employees turned solely on the court's reading of the 'salary basis' requirements in the regulations." 57 Fed.Reg. at 37668. The courts have interpreted the regulations in different ways thus reaching different results as to whether deductions for partial-absences would in fact destroy an employee's "salary based" exemption.

**Actual v. Theoretical Deductions**

16. In 1990, the Ninth Circuit held that the "salary basis" test was not met when a public employee's compensation was "subject to" deductions for absences of less than one day even if no such deductions had occurred. *Abshire*, 908 F.2d 483. "Section 541.118(a) does not require that a deduction for an absence of less than a day *actually* have been made, but only that an employee's pay be *'subject to'* such a deduction." *Id.* at 487. According to *Abshire* whether or not a deduction has ever been made is an "irrelevant" question. "A salaried employee is compensated not for the amount of time spent on the job, but rather for the general value of services performed." *Id.* at 486. *See also Martin v. Malcolm Pirnie, Inc.*, 949 F.2d 611, 615 (2nd Cir.1991) *cert. denied* — U.S. —, 113 S.Ct. 298, 121 L.Ed.2d 222 (1992); *Banks v. City of North Little Rock*, 708 F.Supp. 1023 (E.D.Ark.1988); *D'Camera v. District of Columbia*, 693 F.Supp. 1208 (D.D.C.1988); *Harrison v. District of Columbia*, 30 WH Cas. (BNA) 557, 1991 WL 104260 (D.D.C. 1991).

17. The *Abshire* decision and the cases that followed it caused confusion and exposed governmental employers to potentially enormous and generally unexpected back wage liabilities for many employees who would be clearly exempt but for the treatment of leave and the docking of pay for partial-day absences.

18. However not all courts followed the Ninth Circuit's reasoning in *Abshire*. Some courts held that a salary is not "subject to" deduction in the absence of evidence that an employee's pay was ever reduced. Thus only *actual* and not *"theoretical"* deductions could invalidate the salary basis of compensation. In *Atlanta Professional Firefighters*, the Eleventh Circuit held that the captains' pay was not subject to reductions because of quality or quantity of work as there was no evidence that any captain ever suffered an actual reduction in pay. 920 F.2d at 805; *See also Harris v. District of Columbia*, 709 F.Supp. 238, 241 (D.D.C.1989) (Even though defendant conceded that under its leave policy plaintiff would be subject to a reduction in pay under certain circumstance, the court concluded that the plaintiff was not eligible for the exemption because "no deduction ha[d] actually been made."); *DC Nurses v. District of Columbia*, 29 WH Cas. (BNA) 868, 1988 WL 156191 (D.D.C.1988).

19. This Court is bound to follow the binding precedent in this Circuit that only *actual* and not *"theoretical"* deductions can invalidate an EAP employee's salary basis exemption. *See Atlanta Professional Firefighters*, 920 F.2d at 805. Therefore Broward County is liable, if at all, only to those Plaintiffs who have suffered actual reductions in pay for partial-day absences.

20. Although some courts have also found that reducing leave banks for partial-day absences is contrary to an EAP employee's salaried status, this Court disagrees with that position. "Under 29 CFR § 541.118(b), an employee is considered salaried when he regularly receives a predetermined amount constituting all or part of his compensation. While personal leave, sick leave and/or compensatory time may be part of an employee's compensation package, it does not constitute salary." *International Association of Fire Fighters, Alexandria Local 2141, et. al. v. City of Alexandria, Va.*, 720 F.Supp. 1230, 1232 (E.D.Va.1989) *aff'd* 912 F.2d 463 (4th Cir.1990). Moreover on July 17, 1987, in a letter ruling interpreting agency regulations,

the Department of Labor stated that while deductions in salary are not permitted for absences of less than a day, an employer may require an employee to substitute paid leave for such absences without losing their exemption. *See* Administrative Letter Rulings: Department of Labor, Wage and Hour Division, July 17, 1987. Thus the Court finds that leave banks do not constitute salary, and any reduction to leave banks would not negate an exempt employee's status. *Compare SEIU v. County of San Diego,* 784 F.Supp. 1503, 1504 (S.D.Ca.1992) ("The docking of an employee's leave time for absences from work is as contrary to the notion of salaried status as the docking of base pay.... Such a reduction is entirely inconsistent with salaried status."); *Abshire,* 908 F.2d at 487 n. 3 (The Court commented that requiring employees to take leave time for absences of less than a day might be indicative of non-salaried status, but avoided the question.).

21. Additionally Plaintiffs allege that the County implemented other policies that were inconsistent with an exempt employee's salaried status. These policies are as follows: the County required all employees, including exempt employees, to account for their time by keeping time sheets; some exempt employees were required to complete leave request forms and have them approved in advance for each hour they want to take off; and others were required to earn job basis leave by working two hours every time for every hour of leave; lastly the employees' salary was understood as 2,080 hours annually.

■ 22. In the Court's view, however, these policies are "premised on the concept of public accountability—that governmental employees should not be paid for time not worked, and that there is a need to be accountable to the taxpayers for the expenditure of public funds." 56 Fed.Reg. 45824, 45825 (1991). The concept of public accountability is not inconsistent with the FLSA. Thus the policies employed by the County do not negate Plaintiffs' status as "salary based" employees and make them hourly employees eligible for overtime pay pursuant to the FLSA.

**"Window of Correction"**

23. While the County's deductions did, at the time, constitute an FLSA violation, the Court has further concluded that the Defendant remedied the violation through application of the DOL's so-called "window of correction." 29 C.F.R. § 541.118(a)(6). In pertinent part this section of the "salary basis" regulation states as follows:

[W]here a deduction not permitted by these interpretations is inadvertent, or is made for reasons other than lack of work, the exemption will not be considered to have been lost if the employer reimburses the employee for such deductions and promises to comply in the future.

■ 24. Applying this rule, an employer who improperly makes partial-day deductions may "restore" the affected employees' FLSA exemption by reimbursing the employees their lost wages and promising to comply with the salary basis regulation in the future. *Simmons v. City of Fort Worth, Tex.,* 805 F.Supp. 419, 424 (N.D.Tex.1992); *Keller v. City of Columbus, Ind.,* 778 F.Supp. 1480, 1486 (S.D.Ind.1991); *Hartman v. Arlington County, Va.,* 720 F.Supp. 1227, 1230 (E.D.Va. 1989), *aff'd* 903 F.2d 290 (4th Cir.1990); *International Association of Fire Fighters, Alexandria Local 2141,* 720 F.Supp. at 1232. If the "window of correction" applies, "then it is as if the employees salaries were never 'subject to reduction.'" *Keller,* 778 F.Supp. at 1487.

25. Plaintiffs allege that the "window of correction" is inapplicable to the case at bar as the County had a settled policy and widespread practice of making reductions to EAP employees salaries and leave banks for partial-day absences. Therefore according to Plaintiffs, the County's policy could not be classified as "inadvertent" or the result of any "mistake," and thus the "window of correction" is not applicable.

■ 26. Assuming Plaintiffs are correct that the County had a "settled policy", the Court nonetheless disagrees with the Plaintiffs' position that the "window of correction" is necessarily inapplicable in this case. The "window of correction" has been applied in cases where partial day deductions were made by the employer pursuant to an estab-

lished written policy, *Hartman,* 720 F.Supp. at 1229–30; *Thomas v. County of Fairfax,* 758 F.Supp. 353, 357 n. 8 (E.D.Va.1991), and when the reimbursement did not occur until after plaintiffs had brought suit. *Keller,* 778 F.Supp. at 1487 ("[I]t is irrelevant that the lawsuit brought the errant policy to the City's attention."); *Harkins v. Chesapeake,* 29 WH Cas. (BNA) 1399, 1400, 1988 WL 235927 (E.D.Va.1988). Moreover courts have held that the "window of correction" is available to employers despite longstanding policies of making deductions from EAP employees' pay. "By its own terms, that section [29 CFR § 541.118(a)(6)] contains no time limit within which an employer must correct a deduction." *Keller,* 778 F.Supp. at 1487 (City properly utilized window of correction to preserve exempt status after the lawsuit commenced despite three-year policy of making unauthorized deductions); *See also Simmons,* 805 F.Supp. at 424–25 ("Window of correction" applicable although city-wide policy in effect over four years and resulting in over 20% of the City's exempt employees suffering improper deductions); *Hartman,* 720 F.Supp. at 1230 (two years and ten months).

27. The regulation provides that the "window of correction" option applies when a deduction is "inadvertent *or* is made for reasons other than lack of work". 29 CFR § 541.118(a)(6) (emphasis added). In the Court's view the window of corrections can be applied in this case, regardless of whether the County had a "settled policy", provided the deductions for partial day absences were "inadvertent" or due to "reasons other than lack of work."

28. Certain courts have read the "window of correction" conjunctively, requiring the deduction to be inadvertent *and* for reasons other than lack of work. *See Abshire,* 908 F.2d at 489 (The window is "only applies to an employer that makes a one-time improper deduction and then corrects its error."); *Malcolm Pirnie,* 949 F.2d at 616. However such a "narrow interpretation of the window of correction in § 541.118(a)(6) is

not supported by the language of the regulation itself." *Simmons,* 805 F.Supp. at 425. "As the regulation's text and previous cases have shown, the 'window of correction' applies rather broadly; employers will not be penalized for technical errors that do not go to the substance of the relationship." *Keller,* 778 F.Supp. at 1487. Thus if deductions were made "for reasons other than lack of work" then the "window of correction" is applicable regardless of whether the error was inadvertent. *Id. See also Martin v. W.E. Monks & Co.,* 1993 WL 300332, p. 4 (6th Cir.1993) (The 6th Circuit affirmed the district court's ruling that the "window of correction" was unavailable to the defendants, but held that the district court "misinterpret[ed] the requirements for the applicability of the 'window of correction' by construing inadvertence as a requirement of § 541.118(a)(6).")

29. This Court agrees that the phrase "inadvertent or made for reasons other than lack of work" should be read disjunctively. The record in this case is undisputed that the County never reduced any of the Plaintiffs' salaries for reasons other than lack of work and that the County has reimbursed the affected employees for the deductions with interest. The County has further demonstrated that it took all reasonable steps to ensure that the practice was discontinued and did not recur. Therefore the County is entitled to the benefit of the "window of correction" to insulate it from further liability to the affected Plaintiffs.[6]

30. Moreover the Court finds the "granting of windfall awards of across-the-board retroactive overtime payments to public employees who never had any actual deductions made in their salaries, along with employees who rarely had such deductions, but all of whom would be entitled to substantial back pay under *Abshire* simply because their salaries were theoretically 'subject to' the possibility of docking" to be fundamentally unfair and inequitable. 57 Fed.Reg. at 37669 (discussing State and local government concerns of potential liabilities after *Abshire* ).

---

6. The Court also believes a strong argument can be made that the County's policy was inadvertent due to the uncertainty and confusion in the law.

However the basis for the Court's conclusion that the window of correction applies is stated in paragraph # 29.

31. Thus the Court finds that the County has corrected any previous violations of the FLSA by taking curative steps in expressly amending its personnel policies and reimbursing the affected employees for partial-day deductions. Moreover there has been no evidence presented that the deductions made by Defendant Broward County from EAP employees were made for lack of work. Although the window of correction regulation need not be read conjunctively, the Court finds that the County has satisfied both parts of the regulation as the deductions were both inadvertent and made for reasons other than lack of work. Thus the Plaintiffs have no claim for further relief.

32. In light of the foregoing, judgment shall be entered in favor of the Defendant Broward County. The Defendant shall submit a proposed form of judgment prepared in accordance with these findings and conclusions within ten (10) days from the date of this Order.

DONE AND ORDERED.